**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 06-CV-499 |
| | ) | |
| DOLPHIN MORTGAGE CORP., | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | Magistrate Judge Denlow |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff United States of America ("Plaintiff") filed suit against Defendant Dolphin Mortgage Corporation ("Dolphin" or "Defendant"), alleging that Dolphin committed fraud upon the United States Department of Housing and Urban Development ("HUD") and in so doing, violated the False Claims Act ("FCA"), as amended 31 U.S.C. § 3279, *et seq.* Before the Court are Plaintiff's Motion for Summary Judgment [77], Defendant's Response [86], and Plaintiff's Reply [94]. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is granted in part and denied in part.

**I.      Estoppel**

As a threshold matter, Plaintiff argues that Dolphin should be estopped from denying certain admissions made in two plea agreements arising out of the same operative facts at issue in this case. Collateral estoppel is permissible under the FCA. In fact, the FCA includes a specific provision precluding certain parties from contesting civil liability if there has been a criminal conviction or plea under the same operative facts. The preliminary issue before the Court is the scope of that statutory preclusion and its relation to general collateral estoppel principles.

The FCA provides that "[n]otwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or *nolo contendere*, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730." 31 U.S.C. § 3731(d). Dolphin has neither been convicted nor pleaded guilty to any criminal charges related to the facts at issue in this case. Yet Plaintiff contends that Dolphin is estopped from denying the guilty pleas (and the admissions contained therein) of certain individuals on account of their relationships to Dolphin.

Tamira Smyth ("Tamira")[1] and Nicole Williams ("Williams") each pleaded guilty to one count of mail fraud in violation of 18 U.S.C. § 1341. Tamira had some form of employment relationship with Dolphin, although the parties dispute the extent and precise scope of that relationship. Williams' relationship with Dolphin is even less clear. Plaintiff describes Williams as "Mrs. Smyth's loan processor and co-conspirator" and as someone who "signed a number of fraudulent loan origination documents bearing Dolphin's name." In Williams' plea agreement she is described as Tamira's "personal assistant."

There can be no dispute that the mail fraud charges to which the two pleaded guilty are "criminal proceedings charging fraud or false statements" within the meaning of Section 3731(d). It also is clear – and Defendant makes no argument to the contrary – that the facts giving rise to the criminal pleas involved "the same transaction" as the one before this Court.

---

[1] Tamira used several aliases while engaging in the mail fraud to which she pleaded guilty. For simplicity, and except as otherwise noted, she will be referred to solely as Tamira for purposes of this motion.

The remaining issues are: (i) whether Dolphin can be considered a "defendant" under the statute; and, if so, (ii) what the essential elements of the mail fraud offense are.

In this instance, the Court need not proceed beyond the first question. On its face, the statute is somewhat ambiguous as to the scope of "defendant." One possible reading is that "defendant" is limited to the actual defendant who was convicted or pleaded guilty in the underlying criminal trial. Under that reading, Tamira's and Williams' pleas only could be used against them, individually, in a later civil suit. The other possible reading is that the estopped "defendant" is the defendant in the subsequent civil suit – regardless of whether he or she (or it) was the defendant in the criminal trial. Under that broader construction, Dolphin conceivably could be precluded from denying the essential elements of mail fraud.

In support of its argument, Plaintiff relies on *United States v. Anchor Mortgage Corp.*, 503 F. Supp. 2d 959 (N.D. Ill. 2007), in which the court broadly construed the term "defendant." In so doing, the court reasoned that if Section 3731(d) did not extend estoppel principles beyond the criminal defendant in the underlying case, it would add nothing to general collateral estoppel rules. *Id*. at 959. This Court respectfully disagrees and adopts a different view.

To begin with, although the language of Section 3731 is not crystal clear, this Court believes that the better structural and textual reading of that language indicates that the estopped "defendant" is the party against whom the "final judgment rendered in favor of the United States" in the criminal proceeding. The use of the word "estop" further supports that reading. "Estop" means "to bar or prevent by estoppel," and "estoppel," in turn, is "the barring of a person, in a legal proceeding, from making allegations or denials which are contrary to either a previous statement or act *by that person* or a previous adjudication." WEBSTER'S NEW WORLD COLLEGE DICTIONARY 487 (4th ed. 2007) (emphasis added).

Moreover, even if the term were susceptible to two plausible readings, the legislative history of Section 3731(d) indicates that the purpose of adding subsection (d) was not to expand general collateral estoppel rules to cover other defendants, but rather to permit *nolo contendere* pleas in criminal fraud cases to have preclusive effect in later civil litigation. See Senate Report 99-345, at 13676 (1986) ("Section 3 of the bill amends section 3731 of title 31 by adding a new subsection (d) providing that a nolo contendere plea in a criminal fraud case shall have estoppel effect in a subsequent civil action. Without this amendment, the well-settled rule that a nolo plea would have no collateral estoppel effect in related civil proceedings would apply.") The Senate Report specifically stated that

> "given the high priority which should be afforded to the effective prosecution of procurement fraud cases, an exception [to the general rule making nolo pleas inadmissible] should be made for False Claims Act cases. Moreover, even when the criminal prosecutor wants to pursue his case fully and gain a guilty verdict, the court could still accept a nolo plea over the Government's objection, thus requiring the Civil Division to relitigate the issue. The Committee believes that this would be an unacceptable result; individuals who cheat the Government should not be able to hide behind a nolo plea."

*Id*. The House Report similarly remarked that "[a]nother new provision to the False Claims Act incorporated in H.R. 4827 provides that a nolo contendere plea in a criminal prosecution would estop a defendant from denying liability in a civil suit involving the same transaction. The Committee determined that it was unfair to the Government to allow defendants who are cheating the Government by making false claims to enter a plea of nolo contendere in a criminal case and then force the Government to litigate the same issue for civil purposes." House Report 99-660, at 26 (1986).

Based on the foregoing discussion of the statutory text and legislative history, the Court concludes that the term "defendant" in Section 3731(d) is limited to the defendant in the underlying criminal trial. Because Dolphin itself was not convicted of any fraudulent activity, it

is not a "defendant" for purposes of 3731(d) and therefore is not estopped under Section 3731(d) from denying the essential elements of the plea agreements.

## II.     Background

HUD, through the Federal Housing Administration ("FHA"), is authorized pursuant to Section 203(b) of the National Housing Act, as amended 12 U.S.C. § 1709(b), to insure lenders against loss on mortgage loans made to buyers of single family housing.  Pl. SOF ¶ 1.  Under the program's direct endorsement provisions, the lender makes a determination that the property and the borrower are eligible for mortgage insurance according to HUD's requirements.  *Id*. Thereafter, the lender causes the loan to be closed and submits the prescribed paperwork to HUD for insurance endorsement.  *Id*.  Once the mortgage loan is insured, if the homeowner defaults on the loan and the lender forecloses, the lender may submit a claim under which HUD will pay the balance of the loan, related interest and other costs, and assume ownership and possession of the property.  *Id*. at ¶ 2.  HUD then incurs additional expenses for the management, maintenance, rehabilitation, and marketing of the property until it is resold.  *Id*.

There are several steps in the creation of a HUD-insured mortgage loan.  It begins with a loan originator/loan officer who has the borrower fill out and sign a loan application, sign a credit authorization, sign a borrower's authorization form, submit verification, and determine the type of loan product the borrower wants.  Def. SOF ¶ 10.  The loan originator/loan officer then presents the documents to the loan processor.  *Id*.  The loan processor reviews all of the documents obtained by the loan originator, including mortgage, rent, and bank information, and orders the verification of that information.  *Id*. at ¶ 11.  The loan processor also obtains all documentation and obtains pre-approval from a lender along with all federal and state signed disclosures.  *Id*.  The processor then submits the package to the underwriter.  *Id*.  Underwriting is

a process through which loan documentation is examined and verified to permit the lender to determine whether it wishes to undertake the risk. *Id.* at ¶ 9. In the underwriting process, the lender reviews credit scores, debt-to-income ratios, verification of employment, deposits, bank statements, and other documents. *Id.* The underwriting was not performed by Dolphin. *Id.* at ¶ 21.

Dolphin was approved by HUD to be a "loan correspondent mortgagee," permitting it to originate HUD-insured mortgage loans for sale or transfer to another qualifying mortgagee, known as a "sponsor mortgagee." Pl. SOF ¶ 3. Dolphin was the "loan correspondent mortgagee" for the seven loans at issue in this case. *Id.*

In the fall of 1996, Dolphin interviewed a woman whom they knew as Tamira Russo to work as a loan originator/loan officer on an independent contractor basis. Def. SOF ¶ 1; Pl. SOF ¶ 4. During the interview, Dolphin learned that Tamira previously had worked as a loan originator at another mortgage brokerage. Def. SOF ¶ 3. Tamira provided a drivers' license to Dolphin. *Id.* at ¶ 2. Dolphin did not register Tamira as a loan originator or run a background check on her, nor were they required to do so at the time. Def. SOF ¶ 2; Pl. SOF. ¶ 5. However, as of the time that she applied for the job with Dolphin, Tamira had been arrested eight times for various offenses, including issuance of bad checks, fraud and deceptive practices. Pl. SOF ¶ 6.

Dolphin entered into an independent contractor agreement with Tamira, pursuant to which she was authorized by Dolphin to originate mortgage loans, including HUD insured loans. Def. SOF ¶ 4; Pl. SOF ¶ 8. At the initial interview, Dolphin advised Tamira that, as a matter of company policy, she was authorized to originate, but not to process, HUD loans. Def. SOF ¶ 8. Dolphin trained loan officers in the origination of loans through an internal training course. *Id.* at ¶ 23. Dolphin did not train its loan officers on HUD handbook provisions, but the Illinois

Association of Mortgage Brokers offered a training course on the HUD handbook. *Id*. Dolphin loan officers attended that course. *Id*. It was Dolphin corporate policy that only loan originators could originate HUD loans and that any loan processing took place at the corporate office and by processors. *Id*. at ¶ 5.

For the performance of her duties, Dolphin provided Tamira with the ability to obtain business cards. Def. SOF ¶ 6. She also was allowed access to computer software permitting her to manipulate and enter electronic data into documents that HUD requires lenders to submit as a precondition to mortgage insurance. Pl. SOF ¶ 12. Dolphin provided Tamira with copies of the documents necessary to originate a HUD-insured loan, some of which had "Dolphin Mortgage" preprinted on the form. *Id*. at ¶ 13-14. She also was able to print blank copies of those documents from Dolphin's computer system. *Id*. at ¶ 13. Several of the documents for HUD-insured loans to which Tamira had access, including verifications of employment, verifications of deposit, Addenda to the Uniform Residential Loan Application and verifications of rent, had the name "Dolphin Mortgage" preprinted on them. *Id*. at ¶ 14. As a condition of participation in HUD insured loans, Dolphin was required to file with HUD a list of persons authorized to sign the Addendum to the Uniform Residential Loan Application and Lender Certification ("AURLALC"). Def. SOF ¶ 28. Tamira's name was not on the list of authorized signatories. *Id*.

Generally, after a loan closed, the title company sent Dolphin its loan origination fees in the form of a check. Pl. SOF ¶ 15. Dolphin then would deposit the check in its bank account and pay the loan officer a commission from the fees. *Id*. Dolphin claims that it has no record of receiving its portion of the loan origination fees from the loans at issue in this case. Def. Resp. SOF ¶ 15. However, Plaintiff has attached HUD-1 settlement statements for the loans at issue

stating that Dolphin received origination and broker fees. Pl. SOF ¶ 60. Tamira stated she received her share of the origination fees for the seven loans at issue. *Id.*

While a loan officer at Dolphin, Tamira originated the seven loans at issue in this case. Pl. SOF ¶ 18. Tamira pleaded guilty to one count of mail fraud, 18 U.S.C. § 1341, in connection with her role in the "flipping" scheme. *Id.* at ¶ 16. Nicole Williams also pleaded guilty to one count of violating 18 U.S.C. § 1341. *Id.* at ¶ 17.

The transactions giving rise to this lawsuit were accomplished through back-to-back closings of property in reverse order – that is, the second transaction in the chain of title closed first. Pl. SOF ¶ 19. For the loans in question, a "first purchaser" agreed to acquire property he did not own yet through a cash transaction. *Id.* Tamira or another individual then would recruit a "second purchaser" who, through Tamira's assistance, applied for and received a HUD-insured home mortgage loan. *Id.* The sales contract would reflect that the "second purchaser" was buying the property from the "first purchaser" although the "first purchaser" did not own the property at that point. *Id.* The "second purchaser" "purchased" the property from the "first purchaser" at an inflated price despite the fact that the "first purchaser" did not actually own the property. *Id.* Another individual then would provide the "first purchaser" with funds from the HUD-insured home mortgage loan and the "first purchaser" would use those funds immediately to purchase the property in a cash transaction. *Id.* The individuals involved split the proceeds between the inflated price at which the "second purchaser" purported to have purchased the property from the "first purchaser" and the price that the "first purchaser" actually paid to acquire the property. *Id.*

While working for Dolphin as a loan officer, Tamira completed and submitted loan applications on behalf of "second purchasers" and falsified or knowingly accepted falsified

financial information pertaining to the borrowers to make them appear eligible for HUD-insured loans. Pl. SOF ¶ 20. Tamira knew that the false information eventually would be submitted to HUD. *Id.* Tamira recruited individuals to serve as "second purchasers" and caused payments to be issued to them after the closings were successfully completed. *Id.* at ¶ 22. Tamira caused money to be deposited into the bank accounts of "second purchasers" to make it appear as though they had enough money to make their cash down payments. *Id.* at ¶ 23. She also procured false identification on behalf of herself and others involved in the actions at issue in this case. *Id.* at ¶ 24.

While at Dolphin, Tamira originated loans with computer software provided by Dolphin. *Id.* at ¶ 21. The software allowed her to manipulate loan origination paperwork and type information electronically on the loan application. *Id.* Tamira originated all seven of the loans at issue. Pl. SOF ¶ 18.

In regard to 179 North Leamington, Chicago, Illinois Tamira knowingly (i) "included, or caused to be included" false information in the Residential Mortgage Credit Report, "which made the borrower appear to be more credit-worthy than she actually was"; (ii) "created or caused to be created" a gift letter that falsely represented that the borrower's sister gave her $6,000 to put toward the cash down payment; (iii) "caused funds to be deposited" in the borrower's bank account and then "caused a false bank statement to be submitted" with the loan origination materials with the purpose of making the borrower appear credit-worthy; (iv) "caused" a Verification of Deposit to be submitted with the loan origination materials that made the borrower appear more credit-worthy; (v) made false statements on the Addendum to the Uniform Residential Loan Application, which she signed under the "Officer of Lender" signature

block; and (vi) made false statements on the Lender's Certificate, which she signed under the "Lender's Officer" signature block. *Id.* at ¶¶ 25-30.

As to 7418 Kingston Avenue in Chicago, Illinois, Tamira knowingly (i) included false information in the Pre-Closing Verbal Audit Re-Verification; (ii) falsely represented that she did a face-to-face interview with the borrower;[2] (iii) included false information on the Request for Verification of Employment, which made the borrower appear more credit-worthy than he actually was; (iv) "caused" a false W-2 to be submitted which made the borrower appear more credit worthy; (v) made false statements on the Addendum to the Uniform Residential Loan Application, which she signed under the "Officer of Lender" signature block; and (vi) made false statements on the Lender's Certificate, which she signed under the "Lender's Officer" signature block. Pl. SOF ¶¶ 31-36.

To receive HUD insurance for the property at 3518 West Lexington in Chicago, Illinois, Tamira knowingly "caused" to be included in the loan file (i) a forged Verification of Employment, which made the borrower appear more credit-worthy than he actually was, (ii) a forged W-2, which also made the borrower appear more credit worthy than he actually was, and (iii) a false certification on the Uniform Residential Loan Application that she had done a face-to-face interview with the borrower.[3] Pl. SOF ¶¶ 37-39.

In regard to the 3845 West Gladys property in Chicago, Illinois, Tamira knowingly (i) "caused" to be submitted with the loan application a monthly statement from American Family Credit Union, a forged W-2, and a false Request for Verification of Employment, all of which contained false information designed to make the borrower look more credit-worthy than he

---

[2] The "face to face borrower requirement" may not have been applicable to the purchaser of the property. See Pl. Ex. 36 to MSJ, ML 95-36 (08/02/95).

[3] Again, this requirement may not have applied to this property and this borrower.

actually was; (ii) made false statements on the Lender's Certificate, which she signed under the "Lender's Officer" signature block; and (iii) made false statements on the Addendum to the Uniform Residential Loan Application, which she signed under the "Officer of Lender" signature block. Pl. SOF ¶¶ 40-44.

Tamira's activities in regard to 4429 West Adams Street in Chicago, Illinois are unclear. The testimony that she provided at a criminal trial contradict the declaration that she provided in this case. At the criminal trial of one of her co-conspirators, Tamira testified that she was not aware of any untoward behavior until the closing of the loan. In her declaration, she now states that she originated the loan knowing that the purported seller did not yet own the property and also made false statements and included forged documents. Affidavits that contradict previous deposition are entitled to no weight in summary judgment proceedings unless the affiant gives a plausible reason for the discrepancy. See *Beckel v. Wal-Mart Associates, Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). There is no reason to depart from that rule when the prior testimony was provided at a criminal trial. If anything, such a proceeding provides greater indicia of reliability. Plaintiff has not provided a reason for the discrepancy, and therefore the Court gives no weight to Tamira's statements that she was engaged in fraudulent activity before the closing in regard to 4429 West Adams.

As to the property at 821 North Menard Avenue in Chicago, Illinois, Tamira knowingly (i) included in the loan package a forged Verification of Deposit, which made the borrower appear more credit-worthy, (ii) made false statements on the Lender's Certificate, which she signed under the "Lender's Officer" signature block; (iii) made false statements in the Addendum to the Uniform Residential Loan Application, which she signed under the "Officer of

Lender" signature block; and (iv) "caused" a forged W-2 and Tax Statement to be included with the loan application. Pl. SOF ¶¶ 50-53.

The final property at issue was located at 3939 West Monroe. At that address, Tamira knowingly (i) "caused" to be submitted with the loan application a false Verification of Employment and a forged W-2, both of which made the borrower appear more credit-worthy than he actually was, to be submitted with the loan application; (ii) also "caused" to be submitted with the loan application a false Verification of Deposit, which made it appear as if the borrower had sufficient funds to make the mortgage payments; (iii) made false statements on the Addendum to the Uniform Residential Loan Application, which she signed under the "officer of Lender" signature block; and (iv) made false statements on the Lender's Certificate, which she signed under the "Lender's Officer" signature block. Pl. SOF ¶¶ 54-58.

For six of the loans at issue, Tamira signed and caused to be submitted to HUD an Addendum to the URLA and a Lender's Certificate in which she represented herself as an officer of Dolphin. Pl. SOF ¶ 59. Each of these documents had "Dolphin Mortgage" preprinted in an area that identifies the name of the lender. *Id.* With respect to the property at 3518 Lexington, the corresponding documents were executed by an unidentified individual on behalf of Dolphin. *Id.*

HUD endorsed each of the seven loans at issue. Pl. SOF ¶ 62. HUD would not have been permitted to endorse the loans for insurance had it been aware that any of the documentation accompanying the loan file, which pertained to the borrower's financial qualifications for a HUD-insured loan, were false and fraudulent.[4] *Id.* at ¶ 66. According to the

---

[4] The Court previously granted, in part, Defendant's motion to strike the First Declaration of Charles Martinez. Pl. SOF ¶ 66 is predicated on that declaration. However, in that same ruling, the Court reserved the right to consider and draw its own conclusions with respect to HUD regulations, handbooks, or other materials that may be relevant to the issues. See Docket Entry 120, September 30, 2008.

HUD handbook that was in force at the time that the loans at issue were originated, "all employees who sign applications for mortgage insurance on behalf of the mortgagee must be corporate officers, or be authorized to bind the mortgagee in matters involving the origination and servicing of insured mortgages." *Id*. at ¶ 67. In addition, HUD's Mortgagee Letter 95-36, while permitting outsourcing or "contracting out" of certain clerical loan origination functions, admonishes lenders that "the * * * customary loan officer functions may not be contracted out." *Id*.

Each of the seven loans went into default. *Id*. at ¶ 68. Following default and foreclosure, the mortgage holder submitted claims to HUD for insurance benefits on each of the seven loans at issue. *Id*. at ¶ 69. HUD paid the mortgage insurance claims presented on each of the seven loans. *Id*. at ¶ 70. For the seven loans at issue, HUD expended a total of $981,022.61 – a figure consisting of HUD's claim payment ($917,924.97), taxes ($10,930.60), maintenance ($20,931.81), and sales expenses ($31,235.23). *Id*. at ¶ 71. HUD recovered a total of $294,700 by taking possession of and selling six of the seven properties for which the United States seeks damages. *Id*. at ¶ 72. HUD has received restitution payments of $3,120 from twenty individuals for their participation in the scheme. *Id*. at ¶ 73. On December 14, 2005, the United States executed a settlement agreement with Attorney's Title Guaranty Fund, Inc. ("ATGF"), resolving claims involving eleven properties, including the seven at issue here. *Id*. at ¶ 74. ATGF paid the United States $1,100,000 under the terms of that settlement. *Id*.

---

Additionally, the Court denied Dolphin's motion to strike a Second Declaration of Charles Martinez, which provides the factual support for ¶ 66. The Court permitted Dolphin a chance to file a sur-reply and respond to the declaration and underlying HUD document. Despite repeated extensions of time, Dolphin failed to take advantage of that opportunity.

## III.    Standard of Review

Summary judgment will be granted when the pleadings, the discovery and disclosure materials on file, and any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  A fact is "material" if it might affect the outcome of the action under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Once the moving party makes its initial showing, however, the nonmoving party must demonstrate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324.  Accordingly, the nonmoving party must provide evidence that would permit a reasonable jury to find in his or her favor.  *Liberty Lobby*, 477 U.S. at 255-56.  "If the evidence is merely colorable, or is not significantly probative, summary judgment will be granted."  *Id.* at 249-50 (citations omitted).  In reviewing the evidence, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## IV.    Analysis

This case arises out of Dolphin's alleged failure to "turn square corners when [it] deal[s] with the government."[5]  See *Rock Island, A. & L.R. Co. v. United States*, 254 U.S. 141, 143 (1920) (Holmes, J.).  Plaintiff argues that Tamira violated the FCA – the primary vehicle used by the Government for recouping losses suffered through fraud[6] – as a result of the actions set forth

---

[5] For purposes of the FCA, the FHA is part of the Government of the United States.  See *United States v. McNinch*, 356 U.S. 595, 598 (1958).

[6] See Senate Judiciary Committee, S. Rep. No. 99-345, at 9 (1986).

in detail above and that Dolphin is liable for those actions under the theory of *respondeat superior*.

## A.  Tamira's Liability

The FCA imposes liability on one who "knowingly presents, or causes to be presented" to the United States a "false or fraudulent claim for payment or approval" (31 U.S.C. § 3729(a)(1)), or who knowingly uses a "false record or statement to get a false or fraudulent claim paid or approved by the Government." (31 U.S.C. § 3729(a)(2)).  Plaintiff asserts three ways in which it believes Tamira violated the FCA:  (i) she was involved in the "flipping" scheme described above; (ii) she caused financial documentation which she knew to be false or forged to be submitted with the loan applications for all seven loans; and (iii) she made false statements on the Addenda to the URLA and the Lender's Certifications.

The Court disregards the first asserted basis for liability, because it is not a violation of the FCA, but rather a term that encompasses specific actions that might violate the Act.[7] Dolphin appears to concede that Tamira violated the explicit elements of the FCA through the other two actions and instead argues that material questions of fact exist as to whether Plaintiff has satisfied the judicially created requirement of materiality.  Despite the absence of argument from Dolphin, the Court briefly will analyze the explicit elements of an FCA violation to ensure that no question of material fact exists.

Technically, Plaintiff had no "claims" for FCA purposes until money was distributed from the public fisc.  That did not occur until the lenders foreclosed on the seven properties and the government fulfilled its insurance obligations.  At one time it was unclear whether a lending

---

[7] Dolphin also argues that "flipping" was not specifically against HUD regulations at the time period in question.  Although the regulation that Dolphin cites does not support that proposition, the Court does not rest its opinion on the overall scheme.

institution's demand for reimbursement on a loan that was procured through a fraudulent application was a "claim" under the FCA. See U*nited States v. McNinch*, 356 U.S. 595, 599 n.6 (1958). The Seventh Circuit (and many other courts) since have held that a false statement in a loan guarantee application may constitute a false "claim" if the loan has defaulted thus creating the obligation to pay. See, e.g., *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1373-74 (7th Cir. 1992). The FCA "requires a causal rather than a temporal connection between fraud and payment. If a false statement is integral to a causal chain leading to payment, it is irrelevant how that federal bureaucracy has apportioned the statements among layers of paperwork." *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) (internal citation omitted). The seven loans at issue have defaulted, giving rise to the government's obligation to pay. The seven loans thus constitute "claims" for purposes of the FCA.

As to all but one of the loans at issue, there is no dispute that Tamira knowingly submitted false information and/or made false statements on the Addendum to the Uniform Residential Loan Applications ("AURLA") and Lender's Certificate ("LC"), which she also signed as an alleged officer of Dolphin. "[W]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false. The requisite intent is the knowing presentation of what is known to be false." *Hindo v. Univ. of Health Servs./The Chicago Med. Sch.*, 65 F.3d 608, 613 (7th Cir. 1995) (quoting *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1420 (9th Cir. 1991)). Tamira has admitted to these actions for each of the seven properties and Dolphin has failed to provide any evidence to the contrary except as to the property at 4429 W. Adams.

With respect to that property, Dolphin has pointed to evidence that creates a question of material fact. In particular, Dolphin has cited testimony that Tamira gave in a criminal trial, in which she stated that she was unaware of any untoward behavior until the closing of the loan. Plaintiff makes a cursory argument that failure to report is an FCA violation., but provides no support for its contention. In the alternative, Plaintiff argues that Tamira is liable under 31 U.S.C. § 3729(a)(3), the FCA's conspiracy provision. That is the only reference in Plaintiff's briefs to the conspiracy provision, and without a more developed record and support for the argument, the Court cannot accept that as a potential basis for liability, either. "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived * * * *." *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000). The Court does not have a duty to research and construct legal arguments available to a party. See *Head Start Family Educ. Program, Inc. v. Coop Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995). Moreover, a litigant who fails to support a request with pertinent authority forfeits that request. *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 922 (7th Cir. 1997). There are, however, no disputes of material fact as to the six remaining properties in regard to the explicit elements of the FCA.[8]

While conceding that false claims were submitted, Dolphin argues that questions of material fact exist as to whether the false information, and false statements on the AURLA and LC, were "material" to HUD's decision to insure the loans that eventually defaulted. Beyond

---

[8] The Court must reject Dolphin's overarching argument that a fact question foreclosing summary judgment exists as a result of Tamira's lack of credibility. The Seventh Circuit explicitly has stated that "the district court cannot weigh credibility issues at the summary judgment stage." *AutoZone, Inc v. Strick*, 543 F.3d 923, 934 (7th Cir. 2008) (quoting *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611 (7th Cir. 1993). The cases cited by Dolphin in fact note that "the opposing party may not merely recite the incantation 'credibility," and have a trial on the hope that a jury may disbelieve factually uncontested proof. See *Corrugated Paper Prods., Inc. v. Longview Fibre Co.*, 868 F.2d 908 (7th Cir. 1989) (citations omitted). But where Dolphin has pointed to specific evidence contradicting the affidavit, the Court has denied summary judgment.

showing that the claims are false or fraudulent, Plaintiff must show: "(1) that the alleged false statement or claim was essential to the government's funding decision; (2) that the government specifically relied on the falsity; or (3) that the falsity caused the government to pay out sums it otherwise would not have paid."  John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.04 (3d ed. 2008); see also *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003).  Courts have imposed this additional factor in FCA cases to prevent *de minimis* or insignificant falsities from leading to liability. See Boese, *Civil False Claims and Qui Tam Actions* § 2.04 ("In light of the obvious fact that no regulated party could ever comply with the tens of thousands of applicable laws, regulations, and guide-lines, courts needed to develop a legal mechanism for differentiating those violations that went to the heart of the claim for federal money from those violations that were inconsequential to the funding decision").  The Seventh Circuit follows that approach.  See, *e.g.*, *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008); *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005); *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732 (7th Cir. 1999); see also *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006).

Dolphin argues that to satisfy this requirement, Plaintiff must prove that the fraudulent documents and false statements boosting the borrower's credit-worthiness were the determining factor in HUD approving the loan.  In other words, if the borrower had applied without any "help" from Tamira, HUD may still have approved the loan.  The Court rejects this position for two reasons: (i) the Seventh Circuit uses a less strict standard to analyze materiality and (ii) a HUD regulation precludes endorsement of fraudulently originated loans.

Under Seventh Circuit case law, a "statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decision making body to which it is

addressed.'"  *Rogan*, 517 F.3d 449 (citations omitted); *Luckey*, 183 F.3d at 732 (citing *Neder v. United States*, 527 U.S. 1, 16 (1999)).  *Rogan* contains language suggesting that the materiality requirement has been satisfied:

> Suppose someone who applies for a loan represents that he has a net worth of $2 million, when his actual net worth is -$2 million.  A loan officer might fail to see the minus sign (had one been included), but the lie would be material anyway, because net worth strongly influences lending decisions.

*Rogan*, 517 F.3d at 452.

For six of the seven loans under consideration, Tamira has admitted that she included or caused to be included false information that would improve the financial status of the "second purchasers."  In particular, she forged verifications of deposit or employment, forged W-2s, created false gift letters, and caused false bank statements to be submitted with the loan applications.  Tamira has admitted that these actions were taken to improve the credit-worthiness of the borrower.  It is common sense that information on net worth and employment would have a natural tendency to influence HUD (or any other lender or guarantor) when determining whether to endorse the loans at issue.  See *Rogan*, 517 F.3d at 452.

*Rogan* also supports a wholly independent basis for concluding that Plaintiff has established materiality.  In holding that defendants violated a statute in connection with the submission of claims to the government, the court stated that "[t]estimony from a claims-processing officer along the lines of 'I follow the law' is not required."  *Rogan*, 517 F.3d at 452.  Here, the HUD handbook, in effect at the time of the transactions in question stated that "[i]f, at the time the case is submitted for endorsement, HUD has evidence that there is fraud or misrepresentation on the part of the originating mortgagee, HUD will consider the certifications as fraudulent and will not endorse the mortgage for insurance."  400.4 REV-1 CHG-2; see also 24 C.F.R. § 203.255(c).  That the false statements, including those made on the AURLA and LC,

were not discovered at the time is irrelevant. Had HUD known, it would not have endorsed the loan. As in *Rogan*, HUD need not provide testimony from someone at HUD saying that UHUD would not have approved if it had known the applications contained false statements and certifications. "The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers." *Rogan*, 517 F.3d at 452.

In short, a materiality requirement has been judicially imposed to prevent liability based on false statements unrelated to the claim. But here, the relationship between a false statement as to the ability of an applicant to pay and the decision to insure that borrower is self evident. See *Rogan*, 517 F.3d at 452. There are no questions of material fact on the element of materiality. [9]

Before proceeding to the questions of respondeat superior and damages, a brief detour into the question of "causation" is necessary. In FCA cases, there is a distinction between penalties and damages. A defendant is liable for civil penalties if the elements discussed above are met. However, in order to recover treble damages, the government also must establish causation. See *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992); see also 31 U.S.C. § 3729(a) (a person is liable for "3 times the amount of damages which the Government sustains *because of* the act of that person * * *") (emphasis added). Under the test set forth by the Seventh Circuit, "[i]f the government would not have made a financial commitment absent the claimant's false statement, and the government is nevertheless required

---

[9] *Rogan* also includes a brief discussion on the related concept of reliance, which neither party discussed. In particular, the Seventh Circuit stated that "[r]eliance is an element of a civil action under the False Claims Act but is easy to show: the truth would have revealed that reimbursement is illegal." *Rogan*, 517 F.3d at 452-453. Here, the government has no difficulty in meeting that "easy to show" standard. If, when the loans were presented to HUD, an acknowledgement had been made that the loan applications contained false information and certification regarding the borrowers' financial situation, HUD's regulations establish that it would not have endorsed the loan.

to pay a mortgage insurance claim or a loan guaranty, the government has suffered damage 'because of' the false statement, as required by the Act." *First Nat'l Bank of Cicero*, 957 F.2d at 1374. The court thus has established a "but for" test of causation in FCA cases in this Circuit. *Id*.

Dolphin cites the "but for" test, but appears to confuse it with the element of materiality discussed above. Dolphin's confusion is understandable because causation is directly related to materiality. At the very least, if they are considered separate elements (one for liability and one for treble damages), then satisfaction of materiality almost always would satisfy the causation requirement – and certainly would do so in this instance. Dolphin views the causation issue as requiring Plaintiff to show that the loans would not have been insured "but for" Dolphin's actions. Such a position merely rehashes the materiality question resolved in Plaintiff's favor above. In some jurisdictions, causation presents a more formidable hurdle, because courts require the subject matter of the false statements to be the source of the government's loss. See, *e.g.*, *United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977). However, the court of appeals in this Circuit expressly has rejected such an "unduly restrictive causation requirement." *First Nat'l Bank of Cicero*, 957 F.2d at 1374. Because this Court has held that the false statements were material to the government's decision to insure the properties, and the government was required to (and did) pay the mortgage insurance claims, the causation requirement has been satisfied.

**B.      *Respondeat Superior***

Having held that Tamira herself would be liable under the FCA, the question shifts to Dolphin's responsibility for her actions. Plaintiff argues that Dolphin is vicariously liable because it employed Tamira as a loan officer and she violated the FCA pursuant to the authority that Dolphin granted her. There are two ways in which a principal may be held vicariously liable

for its agent's conduct: (i) the agent is an employee who commits a tort while within the scope of employment (actual authority); or (ii) the agent commits the tort when acting with apparent authority in dealing with a third party on or purportedly on behalf of the principal. Restatement (Third) Agency § 7.03(2).[10] Courts routinely have applied these concepts in the FCA context. See *United States ex rel. McCarthy v. Straub Clinic and Hosp., Inc.*, 140 F. Supp. 2d 1062 (D. Haw. 2001) (collecting cases).

Tamira took many different actions that violated the FCA. Some of those actions clearly were taken within the scope of her employment and subject Dolphin to liability under the actual authority theory of liability. Other actions exceeded the explicit instructions that she was given, but still subject Dolphin under actual authority. Alternatively, even if her actions were so far beyond the scope of her employment, Dolphin would still be liable under the theory of apparent authority. Although the Court will discuss both actual and apparent authority, only one basis is necessary to find Dolphin liable for Tamira's actions under *respondeat superior*.

### 1.    Actual Authority

The central issue in examining whether an employee had actual authority is the scope of the employee's employment. The Court thus turns to the role that Dolphin assigned to Tamira. There is no substantive dispute that Dolphin hired Tamira as a "loan originator" or "loan officer."[11] The disagreement lies in what duties that job encompassed and whether Tamira was acting within the scope of those duties when she violated the FCA. "An employee acts within

---

[10] "In developing the federal law of agency, courts have relied on the Restatement of Agency as a valuable source for those general agency principles. *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 865 n.15 (7th Cir. 1998).

[11] The parties refer to Tamira's official title, without any apparent distinction, as both a "loan officer" and "loan originator." For simplification and clarity, only "loan originator" will be used for the remainder of the opinion.

the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control."  Restatement (Third) of Agency, § 7.07(2).

Dolphin hired Tamira as a "loan originator" and advised her that her duties were limited to origination and that she could not process HUD loans.  According to Dolphin's Rule 30(b)(6) witness, loan origination can include gathering pay stubs, W-2s, and bank statements and submitting verification.  The originator presents these and other documents to the loan processor.  Processing includes reviewing of all documents obtained by the loan originator, ordering verifications of information received (e.g., mortgage, rent and banking information), obtaining all documentation, and obtaining a pre-approval from a lender along with all federal and state signed disclosures.  The processor then submits the package of documents to the underwriter.

Comparing those job descriptions with the actions that led to the FCA violations, it is clear that at least some of Tamira's actions were undertaken as an originator.  Specifically, she acted as a "loan originator" when she included false information and forged documents to make the borrowers appear more creditworthy.  Those actions alone would make Dolphin liable for all of the properties at issue (except 4429 West Adams), and may make irrelevant the fact that signing the AURLA and LC also appear to be beyond the scope of a loan originator.

Additionally, before the principal may be held vicariously liable, the agent must act with "intent to benefit the employer."  *United States v. One Parcel of Land Located at 7326 Highway 45 North, Three Lakes, Oneida County, Wis.*, 965 F.2d 311 (7th Cir. 1992).  That standard may be satisfied, however, by acts that benefit both the principal and the agent.  See, *e.g.*, *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, (7th Cir. 1999);  *Zero v. United States*, 459 U.S. 991 (1982) (acting within the scope of agency defined as acting as authorized and motivated at least in part by an intent to benefit the corporation).  Here, there is uncontroverted evidence

that Dolphin did in fact benefit from the loans through loan origination fees evidenced in the HUD-1 settlement statements and from Tamira's testimony as well. Dolphin's argument that it has no evidence of receiving such fees is unavailing in light of the concrete evidence marshaled by Plaintiff.

Dolphin benefitted from actions within the scope of Tamira's employment, and therefore is liable for the damages to the government resulting from those actions. To the extent that some of Tamira's actions took place when she was acting outside the scope of her employment, the Court discusses below liability under the theory of apparent authority.

### 2. Apparent Authority

Although some of Tamira's actions arguably were outside the scope of her employment as an loan originator, Dolphin nonetheless is liable for the damages caused by those actions because it imbued Tamira with apparent authority on which HUD relied. Under an apparent agency analysis, the Court focuses on what third parties believed the scope of Tamira's authority to be based on Dolphin's actions. A principal may be liable for an agent's wrongdoing even though the agent is acting wholly for himself "[i]f the agent, acting with apparent authority, commits a fraud against a third party who reasonably believed that he was entering into a bona fide transaction with the agent's principal." *Hartman v. Prudential Ins. Co.*, 9 F.3d 1207, 1211 (7th Cir. 1993) (citing *Gleason v. Seaboard Air Line Ry. Co.*, 278 U.S. 349 (1929)).

"An agent acts with apparent authority with regard to a third party when the third party reasonably believes that the agent * * * has authority to act on behalf of the principal and that belief is traceable to manifestations made by the principal." Restatement (Third) of Agency, § 7.08 cmt. b.; see also *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859 (7th Cir. 1998) ("apparent authority is created by the same method as that which creates actual authority, except

that the manifestation of the principal is to the third person rather than to the agent"). Plaintiff argues that HUD naturally would assume that Tamira had authority to engage in the actions giving rise to liability on behalf of Dolphin because: (i) the AURLA and LC identify Dolphin as the lender; (ii) Tamira signed documents under "Signature & Title of Officer or Lender"; (iii) Williams signed fraudulent loan origination docs identifying Dolphin as lender under the signature block reserved for "signature of lender"; (iv) the HUD handbook states that all employees who sign applications on behalf of the mortgagee must be officers or authorized to bind that mortgagee; (v) Dolphin provided Tamira with copies of loan origination docs with Dolphin's name; (vi) Dolphin also provided Tamira with the ability to get business cards; (vii) Dolphin accepted loan origination fees; (viii) Dolphin provided Tamira with access to Dolphin's computer programs which allowed her to enter information and print out forms; (ix) Dolphin performed no background check and armed her with the tools to commit fraud.

The Court rejects some of these asserted bases for liability. For example, providing Tamira with the opportunity to get business cards does not create the appearance that Tamira had authority to process loans or certify documents. If anything, the business cards alone might have been read to limit the scope of Tamira's authority to loan origination. Also, Dolphin's failure to run a background check is not an action by the principal (Dolphin) "which, reasonably interpreted, caused[ed] the third person to believe that the principal consents to have the act done on his behalf by the agent." *Trs. of Chicago Painters and Decorators Pension, Health and Welfare and Deferred Savings Plan Trust Funds v. LaCosta, Inc.*, 397 F.3d 558, 563 (7th Cir. 2005).

Nevertheless, there are sufficient uncontested facts for the Court to find that Tamira was acting with apparent authority in violating the FCA and that Dolphin therefore can be held

responsible under the *respondeat superior* doctrine.  Although Dolphin disputes the name of the exact computer program, it is clear that Dolphin provided Tamira with access to computers that enabled her to print out forms with Dolphin's name pre-printed that were necessary to receive the HUD loans.  Tamira was able to enter data directly into those forms.  In short,

> [W]hen it is the principal itself which clothes the agent with the authority to conduct such activities, and by such actions places the agent in such a position that others will rely on that apparent authority, such principal must bear the loss occasioned by its failure to more discreetly dispense authority.

*United States v. Fox Lake State Bank*, 240 F. Supp. 720 (D.C. Ill. 1965), *rev'd in part on other grounds*, 366 F.2d 962 (7th Cir. 1966).

Tamira also signed documents (AURLA and LC) as if she were authorized to do so on Dolphin's behalf.  Defendant argues that HUD was on notice that Tamira was not permitted to sign these documents because her name was not on the original list provided to HUD.  However, Plaintiff has shown that Tamira did not become associated with Dolphin until after the list was provided and that the applicable regulations did not require the list to be updated.  Rather, the regulations place the onus on mortgagee:  "All employees who sign applications for mortgage insurance on behalf of the mortgagee *must be corporate officers, or be authorized to bind the mortgagee* in matters involving the origination and servicing of insured mortgages."  HUD Handbook 4060.1 Rev-1 ¶ 2-15 (emphasis added).

HUD thus assumes that those signing the AURLA and LC documents are permitted to do so, thus binding the mortgagee.  Dolphin was the party best able to ensure that Tamira only signed documents that were within the scope of her authority.  Furthermore, when Dolphin received origination fees resulting from transactions on which Tamira signed off, Dolphin was on notice that someone from the company indicated to HUD that the loans were legitimate.  At bottom, Dolphin's attempt to disavow Tamira's representations on the AURLA and LC

documents cannot be accepted in light of the Seventh Circuit's pronouncement that the False Claims Act was designed to protect against taking advantage of the "overworked, harried, or inattentive" government officers (*Rogan*, 517 F.3d at 452) – which, in a sense, reaffirms the settled principle that those who deal with the government must "turn square corners." *Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141, 143 (1920).

In sum, applying the undisputed facts of this case to the authorities cited above, Dolphin is liable for Tamira's actions under both actual and apparent authority.

## C. Damages

Plaintiff seeks both civil penalties and treble damages for the seven loans that the government was required to purchase from the lenders. Because the Court has found Dolphin liable for only six of those transactions, it will assess the extent of damages as to those six. Plaintiff seeks civil penalties of between $5,500 and $11,000 per violation. Although the statute limits the penalties to between $5,000 and $10,000 (see 31 U.S.C. § 3729(a)), Plaintiff points the Court to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, which adjusted the amount to between $5,500 and $11,000, 31 U.S.C. § 3729(a); see also 64 Fed. Reg. 47099, 47103 (1999). However, the increased penalties may be assessed only on "violations occurring on or after September 29, 1999." All of the violations occurred before that date; thus, the original penalty range will be applied.

Dolphin contends that the recovery sought by Plaintiff violates the Eighth Amendment because the fines would be excessive.[12] As an initial matter, "[i]t is far from clear that the Excessive Fines Clause applies to civil actions under the False Claims Act." *United States v.*

---

[12] The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

*Rogan*, 517 F.3d 449, 453 (7th Cir. 2008). *Rogan* noted that while treble damages often are grouped with punitive damages – which are not "fines" under the Eighth Amendment – the Supreme Court has noted that penalties paid to the sovereign can be "fines" under the Eighth Amendment. Rogan, 517 F.3d at 453-54 (citing *Browning-Ferris Indus. of Vermont, Inc v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)). The Supreme Court has held that the FCA has a penal component. See V*ermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000); *Cook County v. United States ex rel. Chandler*, 538 U.S. 119 (2003). However, "'penal' does not mean 'excessive,' for judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Rogan*, 517 F.3d at 454 (quoting *United States v. Bajakajian*, 524 U.S. 321, 336 (1998)).

Despite the unsettled nature of this issue, the Court concludes that even if the Eighth Amendment applied to this action, the amount sought by Plaintiff would not violate the Excessive Fines Clause.[13] The Eighth Amendment is violated if the fine is "grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. The parties agree that Plaintiff's actual damages were approximately $980,000. After trebling this amount and subtracting amounts recovered by Plaintiff through sales of the property, a settlement, and restitution, Plaintiff requests $1,545,247.83 in treble damages. Even if the Court imposed the maximum civil penalty of $11,000 for the six violations, the recovery would amount to less than twice the amount of Plaintiff's out of pocket losses. The Supreme Court has found single digit ratios acceptable as not "grossly excessive" in the Fifth Amendment context. See

---

[13] Dolphin also argues that a genuine issue of material fact exists as to whether the recovery sought violates the Eighth Amendment. The Court agrees with Plaintiff that excessiveness is a question of law for the Court. See *Towers v. City of Chicago*, 979 F. Supp. 708, 721 (N.D. Ill. 1997) ("Whether a fine is excessive is a question for this Court to determine.") aff'd 173 F.3d 619, 1999 (7th Cir. 1999); see also *United States v. Real Property Located at 24124 Lemay Street, West Hills, California*, 857 F. Supp. 1373 (C.D. Cal. 1994) (collecting cases)

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). The Seventh Circuit saw no reason that such a ratio would not apply equally in the Eighth Amendment context, and in fact stated that "[i]f there is to be a difference, one would think that a fine expressly authorized by statute could be higher than a penalty selected ad hoc by a jury." *Rogan*, 517 F.3d at 454.

In sum, the Court concludes that the amount sought is not grossly excessive because (i) the resulting multiplier is less than two times actual damages, (ii) "heavier punitive awards have been thought to be justifiable" to ensure that crime does not pay where, as here, the fraud was difficult to detect (see *Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605, 2622 (2008); *Rogan*, 517 F.3d at 454), and (iii) and Plaintiff has failed to cite a single case in which recovery from a corporate defendant within the Congressionally-approved boundaries has been held to violate the Eighth Amendment.

Finally, the Court requests clarification of the amount to be recovered in light of the Court's holding that Plaintiff cannot establish at the summary judgment stage that Dolphin is liable for the property at 4429 Adams. Plaintiff has asked for treble damages of $1,545,247.83 based on six of the seven properties at issue.[14] The Court will not include 4429 Adams in the damage calculation, but without an itemization of the damages alleged to have been caused by that false claim, the Court cannot accurately determine the proper amount of damages. The Court therefore requests Plaintiff to submit a supplemental damage request omitting damages and costs related to 4429 Adams within 21 days of the date of his opinion.

V.    **Conclusion**

Plaintiff's motion for summary judgment [77] is granted in part and denied in part. The Court requests that within 21 days of the date of this opinion Plaintiff file a supplemental brief with respect to the proper calculation of damages omitting any damages for 4429 W. Adams.

---

[14] Plaintiff has not included 821 North Menard in its treble damage request.

The Court also requests that Plaintiff address in its supplemental brief how it wishes to proceed as to that remaining property.

Dated: January 22, 2009

_____
Robert M. Dow, Jr.
United States District Judge